Services, Mr. Webb. Thank you for this opportunity. The critical question in Nathan Nuttall's claim for compensation under the Vaccine Act was whether the MRI scans done of his brain in November of 2005 and October of 2011 show that he had suffered an encephalitis. The record contained four pieces of evidence on the, categories of evidence on that question, the opinion of the radiologist that performed the 2005 MRI, Dr. Huell, the opinion of the neuroradiologist that performed the 2011 MRI, Dr. Jose Balzo, the opinion of Nathan Nuttall's expert witness, Dr. Schumann, who is a neuropathologist and a pediatric neurologist, and the opinion of the secretary's expert witness, Dr. Wisnesser, who is a pediatric neurologist. The Nuttalls have brought this appeal because the special master either did not consider Dr. Balzo's opinion that the MRI scans showed abnormalities consistent with an encephalitis, or did not have a reasonable basis for his decision to give Dr. Balzo's opinion little or no way. The special master's opinion does mention Dr. Balzo's opinion on pages 6, 16, and on pages 23 through 25. On page 6, the special master includes Dr. Balzo's report in his recitation of the facts appearing in the medical records. On page 16, he references Dr. Balzo's disagreement with Dr. Schumann on a not particularly important point in a footnote. And on pages 23 through 25, the special master explains his decision not to include the opinions of Dr. Huell and Dr. Balzo in his analysis of whether or not the MRI scans showed abnormalities consistent with an encephalitis. I believe the special master's failure to include Dr. Balzo's opinion in his analysis amounts to a failure to consider Dr. Balzo's opinion. The special master characterizes his decision not to include Dr. Balzo's opinion in his analysis of what the MRI scans did or did not show as giving the opinion little weight. I believe that the special master's treatment of Dr. Balzo's opinion is arbitrary and capricious whether you consider it a failure to consider the evidence or a decision to afford it little weight because the reasons the special master articulated for giving the opinion little weight are unreasonable. Your decisions in Pollock v. Secretary of Health and Human Services and Moriarty v. Secretary of Health and Human Services, which I submitted as a supplemental authority on April 15, make it clear that if a special master did not consider Dr. Balzo's opinion, his decision was arbitrary and capricious. Those decisions also make it clear that acknowledging the existence of an expert report or other piece of evidence is not the same thing as considering it. In Moriarty, the special master acknowledged the expert witness report and medical articles that he chose not to consider. In Pollock, the special master described both the testimony and the MRI report that he did not consider. Yet in both cases, this court held that the special master's decision not to consider that evidence was arbitrary and capricious. In my brief, I have emphasized the dictionary meaning of consider, that is, to think carefully about a subject, to think carefully in order to make a choice or a decision. I believe consider in the context of this case required the special master to include Dr. Balzo's opinion and the fact that it was the opinion of Dr. Balzo in his analysis of the MRI scans. Dr. Balzo's opinion should have been factored in. His opinion should have been put on the scales when considering what the MRI scans did or did not show. How clear is it that it wasn't considered? The judge commented that Dr. Balzo didn't appear in person and didn't testify, but I didn't see anything to say that what was written was not considered by the special master. Is that accurate? That's correct. If I understood your question, the special master said one of the main reasons he did not consider, that he either did not consider or afforded Dr. Balzo's opinion testimony in any way was because he did not testify. He didn't say that he didn't consider it and weigh it along with everything else? I'm sorry? I don't recall him saying that he didn't consider it. It was a matter of weight rather than the existence of the written opinion. Is that right? Yeah, that is right. If I understand your question, I'm not sure exactly how you consider his approach to Dr. Balzo's opinion. Either he decided that because Dr. Balzo did not testify and because Dr. Balzo's report was brief and because Dr. Balzo may not have been neutral, he either chose not to consider Dr. Balzo's report for those reasons or he chose to afford it little weight for those reasons. I don't think whether you consider it – whether you – we've used the word consider or afford little weight makes much difference because the reasons the special master provided for affording that little weight are unreasonable. There's another angle I thought, which is that there were really four doctors that provided some kind of diagnosis. And the special master saw that, well, there's really two classes of diagnosis among the four doctors. There's two doctors that provided very extensive reports and then came in and actually testified, and the special master got to understand those doctors' experience and qualifications, and that's Schumann and Wisnitzer, I think. And then there's two other doctors, Huell and Balza, who the special master didn't see testify. The special master didn't get to know what their qualifications and experience are. And the diagnoses that the special master had in the record from those two doctors was very brief. Some might say concise, others might just say conclusory, but in any event, it appeared to the special master that the real main event of trying to understand what is the best interpretation of these MRIs was based on all of the evidence and testimony he was getting from Schumann and Wisnitzer. And so when it came to trying to figure out how to fold in Huell and Balza, he treated them kind of on the same level, which is I'm not going to give these two as much weight as I'm going to give to Schumann and Wisnitzer because these two really have a lot more considered evidentiary-based testimony to really evaluate. And so I really ought to be figuring out these two since Huell and Balza actually are conflicting testimony and almost cancel each other out. So maybe if Huell is sort of like this much weight, well, Balza is also about this much weight. And so they're part of the record. They're going to be considered somewhat, but in the end, they don't push the ball forward as a collective matter, especially when the special master has Schumann and Wisnitzer in front of them. Is that a fair assessment of what happened here? I think it's a fair assessment of what the special master said, but I don't think it's an accurate description of what happened in the sense that first, in particular, that Dr. Balza and Dr. Hewitt's reports, you really can't say they're in any way comparable. Dr. Hewitt said this MRI scan is negative, and he only looked at the 2005 MRI. Dr. Balza gave a careful, concise description of specific abnormalities and explained why they were abnormal, and that merited careful consideration. And the real important thing, though, is it's clear, at least to me, and maybe it's not clear to you, that the special master went through and discussed only Dr. Wisnitzer and Dr. Schumann's opinions and came to a conclusion. And then he said, well, I didn't consider these people because they weren't much help. And then he said some things that were just completely not true about Dr. Balza's opinion, and they're unreasonable things. And what Pollack tells us is if there's not a reasonable basis for what the special master does, that's arbitrary and capricious. It wasn't reasonable to not consider Dr. Balza's opinion if he wasn't neutral, because certainly Dr. Wisnitzer and Dr. Schumann weren't neutral. It wasn't reasonable, and according to the Moriarty opinion, it may not be legally justifiable to disregard an opinion or to give it no weight, because it's written as opposed to oral testimony. But he did give it the same weight that he gave to Dr. Hewell's diagnosis, right? The special master, in terms of whatever weight he gave to Dr. Balza's diagnosis, was the same weight he gave to Dr. Hewell's diagnosis. Well, as far as I'm concerned, he could certainly have assigned little weight. That's what I think I saw the special master say, and at the same time, the special master clearly wasn't considering Dr. Hewell's or questioning Dr. Hewell's neutrality. He didn't question Dr. Hewell's neutrality, but it is accurate to say that Dr. Hewell's report contains no explanation of the reasoning behind his finding. That's accurate with Dr. Hewell. It's inaccurate with regard to Dr. Balza. And this was not just some evidence that might have some collateral importance. It was of critical importance. It was an MRI scan reviewed by a neuroradiologist, and he gave specific findings that he said were abnormal that he said were an encephalitis. And those specific findings that Dr. Balza spelled out answer critical issues in the analysis that the special master went through, and he didn't factor them in. And each of the issues that are critical to the determination of whether these MRI scans were abnormal, Dr. Balza had something to say, but the special master didn't factor in what Dr. Balza had to say. He said that the hyperintensities in the paratrigonal region were abnormal because of Nathan's age. That information does not appear in the analysis that the special master used. It doesn't appear in the decision at all. Dr. Balza said that he saw the hyperintensity in the hippocampus in multiple thin cuts through that part of the brain. Multiple. And Dr. Wisniewski's whole defense to the hyperintensities in the hippocampus was that one image that we presented was a, quote, artifact, end quote. And the special master's analysis disregarded what Dr. Balza said, that this image was visible in multiple cuts. And he also disregarded what Dr. Schumann demonstrated by providing in Exhibit 49 another image from a different plane in the MRI scan that showed the exact same abnormality. And Dr. Balza said that the forenesses were inflamed, where the disagreement on the hyperintensity of the forenesses was whether those were the forenesses or the ventricle linings that were inflamed. So the point is that by not factoring what Dr. Balza said, and he did it because it was a written report instead of an oral report, the special master was arbitrary and capricious and did not consider or unreasonably failed to assign weight to Dr. Balza's opinion. Okay, thank you. We'll save you some rebuttal time, Mr. Webb. Mr. Johnson. Thank you, Your Honors. May it please the Court. I'd like to begin by addressing the claim that the special master did not carefully consider Dr. Balza's report. And I think that the issue that counsel is taking with it is that somehow the special master didn't consider the substance of Dr. Balza's report that he focused solely on whether he was neutral or whether he had qualifications to interpret the MRI. But in actuality, the special master did analyze the substance of Dr. Balza's report, and he did this… But if you do consider it, then don't you have a heavier weight in favor of causation than if you just have conflicting viewpoints, which… Well, you're correct. He did have conflicting viewpoints. He had two doctors saying that the MRIs were normal, and he had two doctors saying that there were abnormalities. And it was the special master's job to determine which of those interpretations was more persuasive. The way that he looked at Dr. Balza's report, though, was in the context of examining Dr. Schuman's testimony, because the first two abnormalities that Dr. Schuman testified about were actually the same two abnormalities that Dr. Balza identified in his report. And if you look at the special master's decision, and this is pages 16 through 20 of the appendix, the special master spends all of those pages examining the trigonal hyperintensities and the hyperintensities in the hippocampi, which were the two findings that were identified in Dr. Balza's report. And Dr. Schuman testified that these were the same abnormalities that Dr. Balza was talking about in his report. So the special master actually analyzed what Dr. Schuman was saying about these abnormalities, what Dr. Wisnitzer responded about these abnormalities, and then found that Dr. Wisnitzer was more persuasive in explaining why they were not abnormal. And to the point that counsel raised that Dr. Balza was speaking about the paratrigonal hyperintensities as being abnormal because of Nathan's age, if you look at page 16 of the special master's decision, that's page 17 of the appendix, that page actually does discuss the fact that Dr. Schuman also said that they were abnormal for Nathan's age, and then explained what Dr. Wisnitzer's response to that was, and again found Dr. Wisnitzer to be more persuasive. So the idea that somehow the special master has not carefully considered Dr. Balza's report is just inaccurate based on the record. The special master's decision does address the substance of what was in Dr. Balza's report. But the special master did also have other very reasonable reasons for, as Judge Chen-Yu said, not giving either Dr. Schuhl or Dr. Balza's opinion much weight. And that is that the reports themselves from these radiologists, or Dr. Schuhl was a radiologist and Dr. Balza was a neuroradiologist, while they identify what they saw as the abnormalities, what they do not do is identify the specific images from the MRIs that basically illustrated the abnormalities. And that was what Dr. Schuman and Dr. Wisnitzer did at the hearing. They spent a significant amount of time going through specific images from Nathan's MRIs and showing, pointing out what they thought was abnormal and what Dr. Schuman thought was abnormal. And then in response, Dr. Wisnitzer provided images that were similar to what Dr. Schuman was saying was an abnormal finding in Nathan's MRI, but in the medical literature had been reported as normal. And so Dr. Wisnitzer says, so if you look at these similar images, Dr. Schuman is saying this is abnormal, it's been reported in the medical literature as normal, so I conclude that this isn't necessarily an abnormality. But it was agreed that there was some abnormality, is what I get from the record, and the problem was in tying whatever observed abnormality there is to either to an encephalitis due to the administration of the vaccine, or to the particular, and to the particular disability, which is real. And when you do have medical gaps of that sort, isn't the policy to resolve doubt in favor of the real observed disability? Well, respectfully, Your Honor, Dr. Wisnitzer's testimony was that there were no abnormalities, that he did not see abnormalities in the MRIs. So there wasn't really an agreement that there were abnormalities. The testimony from the government was that there was no evidence in the MRIs of an encephalitis. There's no evidence of encephalitis, but I thought that some abnormality was observed without knowing what it was due to. There were symptoms that Nathan certainly experienced. There was a dispute over when those symptoms arose, but there were clinical symptoms that both experts agreed were consistent with either an encephalitis or childhood disintegrative disorder. And the reason the MRI evidence became so critical is because Dr. Schuman, the petitioner's expert, testified that without an abnormal MRI finding, he would not be able to offer the opinion that Nathan experienced an encephalitis, that the clinical symptoms alone were not sufficient for him to conclude that what Nathan had was an encephalitis. And so that is why the focus of the case became the MRIs and whether there were any abnormalities on there. Dr. Schuman testified that there were. Dr. Wisnitzer testified that there weren't. And the special master at the end of the day found Dr. Wisnitzer's testimony more persuasive because he was able to substantiate what he was saying by providing examples from the medical literature that supported what he was saying. And I briefly just want to address the issue of Dr. Bowes's role as a treating physician. And I think it's important just to understand fully how he became involved in this case. Dr. Schuman testified at the hearing that he first reviewed Nathan's 2005 MRI sometime in the summer of 2011. And after reviewing the MRI, he decided that he wanted Nathan to undergo a second MRI. And he said to, quote, test the correctness of his observations and inferences. Dr. Schuman then sent a letter to Nathan's pediatrician in Las Vegas at the time, Dr. Winkler. And this letter stated that while the radiologist, Dr. Huell, who had performed the 2005 MRI, had interpreted it as being normal, Dr. Schuman interpreted it as showing evidence of a limbic encephalitis. And so what he wanted Dr. Winkler, the pediatrician, to do was to refer Nathan to Dr. Barkovich in San Francisco for a second MRI. Unbeknownst to Dr. Schuman, petitioners had moved to Georgia during this timeframe, and Nathan was no longer being treated by Dr. Winkler. So the next thing that appears in the record is on September 27th of 2011, Nathan had his initial consultation with a pediatric neurologist in Georgia named Dr. Fisher. And Dr. Schuman is listed as one of the referring physicians on the record. And the record also states that an MRI that had been previously done showed evidence of an encephalitis. Dr. Schuman testified at the hearing that he assumed the way that—and the record also references a note from Dr. Schuman. And Dr. Schuman testified that he believes what happened was Dr. Winkler in Las Vegas forwarded a copy of his letter to Dr. Fisher, and that's what she had in her possession when she first saw Nathan. Nathan then had his second MRI done on October 24th of 2011. The physician who ordered the MRI is listed as Dr. Squires, and their briefing petitioners represent that Dr. Squires is Nathan's uncle and an oncologist, but there's nothing in the record to confirm that. What is clear is that Dr. Bauza references in his report a history of previous encephalitis, which plainly indicates that someone had communicated to him an opinion that Nathan experienced an encephalitis. Nowhere in the medical records do any of Nathan's treating physicians diagnose him with an encephalitis. The only source of the statement could have been the note from Dr. Schuman, whether that was provided to Dr. Bauza directly or whether it was communicated to him indirectly. In any event, it was perfectly reasonable based on this evidence for the Special Master to conclude that Dr. Bauza's interpretation of the MRI evidence could have been influenced by Dr. Schuman's opinion provided to him that Nathan had experienced an encephalitis, and Dr. Schuman is the only person who had provided that opinion at that point. So it was reasonable for the Special Master to conclude that this MRI was not done for purposes of treatment. It was done in furtherance of this claim, and therefore treating Dr. Bauza as a true treating physician under this court's precedent that provides a treating physician opinion significant weight, that Dr. Bauza's opinion wasn't entitled to deference for that reason. It's not quite fair when you can't expect an afflicted family to look ahead and read the fine points of the law that no one else has read and think, well, we'd better do this because 11 years from now, we may need to establish a claim. If, in fact, there was some observation of encephalitis, which was communicated to a treating physician along with other observations, doesn't that have to be taken at reasonable face value? We see adverse consequences. The only question is, if it was encephalitis, I think that's a table injury. Is it not? So that makes it easier to establish one's claim. Yes, Your Honor, and it was entirely reasonable for the family to obtain the second MRI. The only point I was trying to make is that the Special Master, in looking at how to analyze this MRI, took into consideration the fact that somebody had communicated to Dr. Bauza that they believed that Nathan had experienced a past encephalitis. And as evidenced by the competing opinions from Dr. Huell and Dr. Wisnitzer and Dr. Schuman and Dr. Bauza, reading MRIs is as much of an art as it is a science, that there can be different interpretations by qualified experts looking at the same MRIs. And I think the Special Master reasonably concluded that if somebody had told Dr. Bauza that Nathan had experienced an encephalitis in the past, that in looking at the MRIs, he might have been influenced and been looking for things that would confirm that. And so it doesn't necessarily… Isn't that how it works in the medical profession? This is an art as much as a science, as you say? Well, absolutely. But I think the only point I was making is that it was reasonable for the Special Master to take that into consideration in determining how to analyze Dr. Bauza's report and how much weight it deserves. Okay. And unless there are further questions, we would ask the court to affirm the Special Master's decision below. Okay. Thank you, Mr. Johnson. Mr. Webb, you have some rebuttal time. I appreciate you giving me a few more minutes, and it won't take long. One, the Special Master that decided this case did not hear the witnesses. He was not present at the entitlement hearing. The case was assigned to him after the entitlement hearing. So there really is no difference between the documentary evidence provided by Dr. Bauza and the documentary evidence of the transcript. Two, it's not reasonable to suggest that a highly qualified physician, a board-certified neuroradiologist, is going to see something that's not there because another doctor had a diagnosis of encephalitis, and that doctor was Dr. Fisher. And Dr. Fisher may have been – she probably did – she apparently did have the letter from Dr. Shuman, but that's all. She had a letter from Dr. Shuman in which Dr. Shuman asked Dr. Winkler to refer Nathan to a neuroradiologist because he needed a scan to see whether he had an encephalitis. And that would have helped the case, and it would have helped treatment of Nathan as well. And whether or not Dr. Bauza was a treating physician, that doesn't mean his opinion shouldn't have been considered or that it should have been given so little weight. It's unreasonable for the special master to simply – whatever you use it – to not use an opinion in the medical records of a child when analyzing a well-qualified witness. To consider – it's just unreasonable for him not to consider that or to give it so little weight. To dismiss it as if it was redundant, because it wasn't redundant. There is a very significant difference between discussing Dr. Shuman's opinions and not acknowledging that a neuroradiologist that actually saw the scans first had similar supportive opinions that addressed the specific issues addressed by the expert witnesses and going over the same territory. In other words, if you read only the opinion from the special master, you wouldn't know that Dr. Bauza had the critical opinion that the hyperintensities in the paratrigonal region were abnormal because of age. Age being the critical issue that Dr. Shuman and Dr. Wisnesser disagreed about. If you read only the special master's opinion, you wouldn't know that Dr. Wisnesser identified one image in which the hyperintensities in the hippocampus were an artifact. Only one image. And there are hundreds of images in an MRI scan. You wouldn't know that Dr. Bauza said, I saw this in lots of different, multiple slices through the hippocampus. You wouldn't know that. And you wouldn't know that Dr. Bauza specifically said that I see hyperintensity in the fornices greater in the left than the right. Which suggests that this was clearly in the fornices, not in the ventricles. These were the three critical factual questions on which Dr. Wisnesser and Dr. Shuman disagreed. And to not calculate, to not even describe or articulate what the evidence was available from a written report from a neuroradiologist in making that decision is unreasonable. It's arbitrary. It's capricious. I'm going to ask you to remand this case so that it can be considered. Thank you, Mr. Webb and Mr. Johnson. The case is taken under submission. That concludes the argued cases for this morning.